# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

KENNETH PALMER,

      Plaintiff,

v.                                       Case No. 8:13-cv-01784-T-02JSS

ROBERT A MCDONALD,
Department of Veterans Affairs,

      Defendant.

_____/

## **ORDER**

This employment action concerns reasonable accommodation requests under the Rehabilitation Act. The matter comes to the Court on a motion for summary judgment from Defendant Wilkie as Secretary of the Department of Veterans Affairs.[1] Dkt. 115. Plaintiff has filed an opposition. Dkt. 116. The parties have also briefed the Court on the issue of exhaustion of administrative remedies. Dkts. 122, 123. The Court GRANTS Defendant's motion.

## BACKGROUND

This case stems from Plaintiff's former employment with Defendant. From May 2010 to October 2012, Plaintiff worked at a regional office of the Department

---

[1] When this action was filed, Robert McDonald served as the Secretary.

of Veterans Affairs as a Veterans Service Representative (VSR). Dkt. 36 ¶ 6. From October 1, 2011 to December 12, 2011, Timothy Wright was Plaintiff's "coach" and immediate supervisor. *Id.* ¶ 4; Dkt. 44-7 to 44-8. Plaintiff reported numerous problems he had with Timothy Wright to other individuals at the regional office, which form the basis of most of the claims in this action. *See* Dkt. 36.

Lillian Viera-Figueroa was the Assistant Veterans Service Manager, making her Wright's supervisor. Dkt. 36 ¶ 4. Sandra L. Smith was the Veterans Service Center Manager. *Id.* Kerrie Witty was the regional office's Director. *Id.* Dan Soto became a first-line supervisor and assistant coach of Plaintiff sometime in 2012. *Id.* Jean Morgan was the first-line supervisor of Soto and the second-line supervisor of the Plaintiff sometime in 2012. *Id.*

Tamanique Clarke was a human resources generalist from May 2010 to October 2013 who handled reasonable accommodations. Dkt. 115-1 at 3. Her role was the "local reasonable accommodation coordinator" or "LRAC," which required her to "assist supervisors and management officials with processing requests for reasonable accommodations." *Id.* at 4. In her deposition, Clarke outlined her responsibilities for handling reasonable accommodation requests: "[M]eeting with the employees and providing them a reasonable accommodation packet. Once I received it back it would either have the medical form completed by their physician, or a physician chose to use their own separate letterhead or write-

up. It would come back with that and then we'd go from there with providing the accommodation that the employee requested, or what the physician stated would be appropriate for the employee." *Id*.

In 2013, Plaintiff brought claims against Defendant for race and national origin discrimination (Count I), retaliation (Count II), disability discrimination and failure to reasonably accommodate disability (Count III), hostile work environment harassment (Count IV), and injunctive relief (Count V). Dkt. 36. Following the U.S. Court of Appeals for the Eleventh Circuit's opinion on the Court's prior order on a motion to dismiss, only the claim for failure to reasonably accommodate a disability in Count III remains. Dkt. 60.

As whittled down by the appellate court, Plaintiff alleges that Defendant failed to reasonably accommodate his need for: additional computer training to help him process claims and, related, excluded time to allow him training to prepare for upcoming, new work processes; time to get a pen and paper to write down instructions; a computer mouse pad that would alleviate wrist pain; and an ergonomic chair until months after his request. *See* Dkts. 36, 60 at 13-14.

According to Plaintiff, his initial contact with the Office of Resolution Management (ORM) concerning his claims was on January 6, 2012. Dkt. 36 ¶ 7. On January 14, 2012 he filed a charge with the Equal Employment Opportunity Commission (EEOC). Dkt. 36 ¶ 7; Dkt. 122-4 at 1. In the charge, he sought a

"cease and desist of prolongation of hostile work environment, reprisal, and adverse employment actions. Mr. Wright should attend sensitivity/EEO/ADA training as soon as possible. Appropriate corrective action also seems warranted." Dkt. 122-4 at 1. As for the claims section in the charge, Plaintiff referred to attached letters to ORM's Kimm Lenox. *Id.* The letters mostly concern Plaintiff's race-based discrimination allegations. *Id.* at 3-6.

On November 5, 2018, the Court denied without prejudice a pending motion for summary judgment. Dkt. 111. Defendant filed the instant motion on November 26, 2018, arguing that Defendant made good faith efforts, in consultation with Plaintiff, to make a reasonable accommodation. Dkt. 115. On December 21, 2018, the Court requested supplemental briefing on any failure to exhaust argument. Dkt. 117.

## SUMMARY JUDGMENT STANDARD

Under Rule 56, Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Mize v. Jefferson City Bd. of Educ.,* 93 F. 3d 739, 742 (11th Cir. 1996). If met, the burden shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial." *Shaw v. City of Selma*, 884 F. 3d 1093, 1098 (11th Cir. 2018) (citation omitted).

"A fact is 'material' if it has the potential of 'affect[ing] the outcome of the case.'" *Shaw*, 884 F.3d at 1098.  And, to raise a genuine "dispute," the nonmovant must point to enough evidence that "a reasonable jury could return a verdict for [him]." *Id.* (modification in original). The Eleventh Circuit further teaches that "[w]hen considering the record on summary judgment 'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Id.* (citations omitted).

## DISCUSSION

The Rehabilitation Act "prohibits federal agencies from discriminating in employment against otherwise qualified individuals with a disability."[2] *Sutton v. Lader*, 185 F.3d 1203, 1207 (11th Cir. 1999) (citing 29 U.S.C. § 791). To establish a prima facie case of discrimination under the Act, an individual must show that (1) he has a disability; (2) he is otherwise qualified for the position;[3] and (3) he was

---

[2] Unlike the Americans with Disabilities Act, the Rehabilitation Act specifically protects federal employees, yet the "standard for determining liability under the Rehabilitation Act is the same as that under the ADA." *Sutton*, 185 F.3d at 1208 n.5; *see also Allmond v. Akal Sec., Inc.,* 558 F.3d 1312, 1316 n.3 (11th Cir. 2009) (discussing ADA and Rehabilitation Act claims together and relying on cases construing the statutes interchangeably).

[3] It seems undisputed that Plaintiff is a "qualified individual" as defined by 42 U.S.C. § 12111(8). *See Moore v. Jackson Cty. Bd. of Educ.*, 979 F. Supp. 2d 1251, 1261-62 (N.D. Ala. 2013) (applying definition to Rehabilitation Act case). "Determining whether an individual is 'qualified' for a job is a two-step process. First, does the individual satisfy the prerequisites for the position; does the individual have sufficient experience and skills, an adequate educational background, or the appropriate licenses for the job? Second, can the individual perform the essential functions of the job, either with or without reasonable accommodations?" *Reed v. Heil Co.*, 206 F.3d 1055, 1062 (11th Cir. 2000) (citations omitted). Indeed, Plaintiff has consistently received superlative performance reviews, his purported impairments notwithstanding.

subjected to unlawful discrimination as the result of his disability. *Id.* Furthermore, like the Americans with Disabilities Act (ADA), "the Rehabilitation Act imposes a duty on entities covered by the act to provide employees with a disability a reasonable accommodation." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999). An employer's failure to reasonably accommodate a disabled individual is itself discrimination, and the plaintiff does not bear the additional burden of having to show that the employer acted in a discriminatory manner toward its disabled employees. *Holly v. Clairson Indus.*, 492 F.3d 1247, 1262 (11th Cir. 2007). "The burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of [his] job rests with that employee, as does the ultimate burden of persuasion with respect to showing that such accommodation is reasonable." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000) (citation omitted).

The Court finds that Plaintiff has been afforded adequate notice and opportunity to present evidence on all aspects of his remaining claims, not just Defendant's good faith argument. Plaintiff filed a supported response in opposition to Defendant's original motion for summary judgment that covered the below analysis. Dkts. 44, 47, 72. The Court further finds that, even if Plaintiff has exhausted all his administrative remedies, he was provided additional training and an ergonomic chair. Furthermore, he has not identified a qualifying disability or

reasonable accommodation for the note-taking and wrist pad requests. The Court will handle the requests for reasonable accommodation in turn.

## I.  Additional Training

Plaintiff argues that he did not receive additional training as a reasonable accommodation. As alleged as an amendment to his EEOC charge, "[f]rom July 12, 2012 to July 31, 2012, the complainant was given the runaround about his request for Standardized Notification Letter (SNL) training as an accommodation." Dkt. 122-5 at 1-2; *see also* Dkt. 36 at 13. But Plaintiff has not established a disability that would necessitate the additional training, and even if he has, he did in fact receive extensive and additional training.

To demonstrate a disability, a plaintiff must show: (1) that he has a physical or mental impairment that substantially limits him in one or more major life activities; (2) that he has a record of such an impairment; or (3) that the employer regarded him as having such an impairment. 42 U.S.C. § 12102(1). "Major life activities" include, but are not limited to: caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(i).

The relevant disability for the inadequate training claim is presumably short-term memory loss that impairs Plaintiff's ability to remember instructions. Dkt. 36

¶ 9a; *see, e.g.*, Dkt. 44-2 at 11-12, 24, 28-30. But to necessitate an accommodation, the disability must substantially limit a major life activity. *See, e.g.*, *Coleman-Adebayo v. Leavitt*, 326 F. Supp. 2d 132, 142 (D.D.C. 2004).

Plaintiff was examined for his short-term memory concerns by a neuropsychologist in Maine.[4] Dkt 45-4 at 3-9. Plaintiff "denied difficulty performing basic daily activities," including dressing, grooming, household chores, meal preparation, shopping, paying his bills, and driving. *Id*. at 3. The Maine neuropsychologist did not recommend any specific reasonable accommodation for short-term memory loss, Dkt. 44-2 at 29, and Plaintiff has not used his report to support an accommodation request in St. Petersburg, including for additional training. Dkts. 45-5, 45-6, 45-7. To support the request, Plaintiff instead included a physician's report dated September 7, 2012. Dkt. 106-5 at 8. The basis of the impairment was poor concentration and memory loss. *Id.* But the only listed activities that the impairment limited was "memory issues, learning will take longer." *Id.*

Similarly, Plaintiff has not received medical treatment for short-term memory loss. Dkt. 44-2 at 29. Plaintiff has, moreover, held jobs that require him to learn new skills: law enforcement, home sales, handling Agent Orange claims in

---

[4] In Maine, Plaintiff requested a reasonable accommodation transfer to Florida because his physical disabilities are aggravated by cold weather. Dkt. 44-2 at 30; Dkt. 45-5.

Maine, disability claims in St. Petersburg, and most recently worker's compensation claims in Colorado. Dkt. 44-2 at 4, 76. What is more, Plaintiff was "fully successful" in meeting productivity requirements in St. Petersburg, even after the new SNL process was introduced. Dkts. 46-3, 46-4. Plaintiff does contest his own performance level, noting that his record might not warrant a promotion that he received. Dkt. 44-2 at 43. He nonetheless accepted the promotion. *Id.*[5]

Even if Plaintiff's disability did require an accommodation in the form of additional training, Defendant provided it.[6] There is moreover no evidence he was ever denied a specific request for additional training for SNL or otherwise. Quite the contrary, on August 21, 2012, Plaintiff sent a request to Director Witty for more training. Dkt. 45-11 at 2. On August 23, 2012, Witty responded in part:

> [Sandy Smith] asked you if you felt you needed additional training on SNL to let her know and you responded that you would like additional training on

---

[5] The mere fact that Defendant approved Plaintiff's requests for a reasonable accommodation does not require the Court to find Plaintiff was disabled. Plaintiff cites no authority to support the proposition that such an approval can bind a court's determination. While potentially relevant to a "regarded as disabled" theory, Plaintiff advanced no such theory in his pleadings. Moreover, since its amendment in 2008 and effective date of January 1, 2009, the ADA does not require reasonable accommodations of regarded-as plaintiffs. *Powers v. USF Holland, Inc.*, 667 F.3d 815, 823 n.7 (7th Cir. 2011) (citation omitted); 42 U.S.C.A. § 12201(h); 29 C.F.R. § 1630.9(e). Lastly, it would lead to bizarre results to hold that an employee was disabled simply because an employer sought to accommodate an employee, whether or not that employee requested a reasonable accommodation. *See, e.g.*, *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 335 (7th Cir. 2004).

[6] Plaintiff, in fact, received extensive training besides this. All VSRs are required to complete 85 hours of training a year, which Plaintiff completed. Dkt. 44-5 at 3; Dkt. 45-9. Plaintiff also received training as a VSR at the VA Academy prior to his position in Maine, Dkt. 44-2 at 4-6, and at least some of a refresher training and a three-month familiarization period upon his arrival in St. Petersburg. Dkt. 44-2 at 33-34. Plaintiff does not contend his first coach, Piazza, denied him any of the training he needed. *Id.* at 34. Plaintiff's record at St. Petersburg shows he completed numerous training segments pertinent to his job. Dkt. 45-13.

SNL. Eight hours of additional, one on one training, was provided to you last week on SNL by a member of the [Quality Review Team]. When asked, you replied to your Coach that the training was very good. If you feel you need more additional training on SNL, please let your supervisor know and we will make arrangements for additional training.

Dkt. 74-2. Indeed, in addition to the training that all VSRs received on the SNL system (including both group and one-on-one training),[7] Plaintiff received eight hours of one-on-one training with Tiffany Vega, the Quality Review and Training (QRT) Coordinator. Dkt. 44-5 at 3. According to Vega, she provided the training, and Plaintiff was able to perform the tasks he previously had difficulty performing.[8] *Id.* at 7.

Additionally, productivity numbers were eased for all VSRs including Plaintiff, and excluded time for training was provided. *Id.* at 3. After the session with Vega, Morgan followed up: "If you need additional assistance – you have George Barr (Stream 4 IPR), Sherman Coleman and Stephanie Florio (SNL

---

[7] It is worth noting that Plaintiff was not alone in finding the new processes with SNL challenging; this suggests the difficulty was not due to a mental impairment. In his words, "[e]veryone was struggling. . . . Even the people without disabilities were struggling." Dkt. 44-2 at 19, 46 ("They were complaining about the poor training that was being given. They were complaining about the complicated system . . . how they were expected to learn that in a few hours of training."). Presumably this explains why Defendant continued to provide training, relaxed productivity numbers, and excluded time for its employees. "Excluded time" allows for a VSR to "go and do a different task instead of doing claims," which, in theory, adjusts productivity goals. *Id.* at 41.

[8] Plaintiff also contests the quality and duration of the training, calling it "crap" and lasting no more than two hours. Dkt. 44-2 at 45. But the very nature of the training was for the instructor to, at least for a portion of it, leave Plaintiff alone to "try some cases" and remain available to answer questions the "20 to 30 times" Plaintiff needed her to. *Id.*

SME's) at your disposal." *Id.* at 6. She added that "we all make mistakes. You will

have a 60-day grace period before promulgation errors can be called by QRT." *Id.*

What Plaintiff perceives as "the runaround" for his training request was

proper protocol for a request without supporting medical documentation. As HR

Manager Wax wrote to Plaintiff on August 27, 2012:

> In November 2011, you met with Tammi Clarke, HR
> Specialist to discuss your medical needs. Specifically,
> you asserted a need for a chair, and wrist pads. You also
> mentioned a sleep disorder that you claimed caused
> memory and concentration problems. During the meeting
> you were informed that you must provide medical
> documentation to support requests for accommodation.
> The documentation you provided on December 19, 2011,
> only supported the need for an ergonomic chair. You
> received a copy of the Agency's approval of your
> accommodation request for an ergonomic chair on
> January 3, 2012. In that approval, you were reminded
> that it [is] your responsibility to notify Human Resources
> if your condition changes or if a change in the
> accommodation is warranted. The Agency did not
> receive further communication from you until your
> August 21, 2012 email.

Dkt. 106-5 at 16. And on August 28, 2012, Clarke sent Plaintiff an email

reminding him that "the Agency cannot move forward with your request until the

medical documentation is received because we do not have enough information to

make a determination as to whether you are a 'qualified individual with a

disability.'" Dkt. 45-7 at 8.

Plaintiff later submitted the September 7, 2012 physician's report, and, on September 19, 2012, his request was promptly approved. Dkt. 45-7 at 2. The approval form instructed Plaintiff to "[p]lease inform your supervisor of any additional training that you need so that training sessions with QRT can be arranged for you. This training will be counted as excluded time." *Id*. Plaintiff is unable to point to a specific instance on the record where, after this point, he made a specific request for additional training for SNL or otherwise that was denied.

This shows that, more than simply engaging in a good faith, interactive process with Plaintiff, Defendant actually provided him with a reasonable accommodation. *See Batson v. Salvation Army*, 897 F.3d 1320, 1326-27 (11th Cir. 2018) ("The record reflects that . . . [the plaintiff] received all of the time off and adjustments to her schedule that she had requested. . . . [W]ithout evidence of a specific instance in which [she] needed an accommodation and was denied one, she cannot establish a failure to accommodate."). No reasonable juror could find otherwise. Summary judgment is granted on Plaintiff's additional training claim.

II.    Time for Note-taking

Plaintiff has neither established a qualifying disability nor properly identified a reasonable accommodation for his short-term memory problem. In the absence of either, Defendant cannot be found liable. Because the short-term

memory is relevant to both additional training and note-taking, the same analysis on the disability applies.

But even if the short-term memory is a qualifying disability, there are various flaws to Plaintiff's claim. First, a federal employee must initiate contact with an EEOC counselor within 45 days of the alleged discriminatory act to attempt resolution of the matter. *Shiver v. Chertoff*, 549 F.3d 1342, 1344 (11th Cir. 2008); 29 C.F.R. § 1614.105(a)(1). Failure to do so generally results in the claims at issue being barred for failure to exhaust administrative remedies. *Shiver*, 549 F.3d at 1344; *see also Gaillard v. Shinseki*, 349 F. App'x 391, 392 (11th Cir. 2009).[9]

In any event, Plaintiff has not met his burden to identify a reasonable accommodation, which is defined as "[m]odifications or adjustments to the work environment, or to the manner of circumstances under which the position held or

---

[9] Yet a timely filing with the EECO "is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393 (1982); *Doak v. Johnson*, 798 F.3d 1096, 1104 (D.C. Cir. 2015). Defendant did not raise this as a defense in its Answer. Dkt. 70. Furthermore, this 45-day clock does not apply where the employee was not notified or otherwise aware of the time limits, *see* 29 C.F.R. § 1614.105(a)(2), which Plaintiff suggests happened. Dkt. 124 at 5. It is also worth noting that some circuits have recognized an exception for a "continuing violation" that may or may not apply. *See Henrickson v. Potter*, 327 F.3d 444, 447 (5th Cir. 2003) (finding for employer because of expiration of 45-day period and a single request for a custom chair did not constitute a "continuing violation"). Nor does Defendant challenge that suit was brought within 90 days of receiving a right-to-sue letter, another non-jurisdictional question. *See, e.g.*, *Fouche v. Jekyll Island-State Park Auth.*, 713 F.2d 1518, 1526 (11th Cir. 1983). Be that as it may, as relevant to Plaintiff's other remaining claims, failure to include allegations of discrimination on an EEOC charge can be a jurisdictional bar. *See Williams v. Brennan*, 320 F. Supp. 3d 122, 129 (D.D.C.), *reconsideration denied*, 322 F. Supp. 3d 140 (D.D.C. 2018). It is the EEOC's final disposition of the charge that confers jurisdiction. *See Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006).

desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 20 C.F.R. § 1630.2(o)(1)(ii). "[W]here a plaintiff cannot demonstrate 'reasonable accommodation,' the employer's lack of investigation into reasonable accommodation is unimportant." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 n.2 (11th Cir. 2001). This is true even if an employer does not engage the employee in an interactive process. *Id.* Indeed, the ADA and Rehabilitation Act are not intended "to punish employers for behaving callously if, in fact, no accommodation for the employee's disability could reasonably have been made." *Id.*

Plaintiff contends that since October 4, 2011, Defendant failed to accommodate his disability and discriminated against him by failing to give him time to write things down. Dkt. 36 ¶¶ 9a, 10b. Turning to the record, Plaintiff emailed an accommodation request to Sandy Smith in October 2011. Dkt. 44-2 at 36. In the email, Plaintiff did not request any specific accommodation for his memory problems, stating only "[i]t might be time for us to consider if some kind of accommodation can be made." Dkt. 45-8 at 3.

Plaintiff had a one-on-one meeting with Wright on October 11, 2011 in which Plaintiff claims he told Wright about his memory problems and requested time to write things down. Dkt. 44-2 at 35. The next day Wright emailed Plaintiff,

stating, "You mentioned some issues that are medical in nature, therefore, I am referring you to Tammi Clarke in HR so you can discuss your concerns and options available to you." Dkt. 45-9 at 2. Plaintiff responded that he had done so. *Id*.; *see also* Dkt. 45-10. This referral was consistent with the practices for handling Plaintiff's accommodation requests in Maine. Dkt. 44-2 at 35.

Plaintiff wrote a two-page email to Wright on October 13, 2011 regarding their "one-on-one conversation" but made no reference to note-taking. Dkt. 44-9. Nor can Plaintiff specifically recall sending Wright an email requesting time to write things down or any witness to any such request. Dkt. 44-2 at 52-53. Plaintiff did not ask for time to write things down in his email to Smith, Dkt. 45-8, or in his first request for accommodation, Dkt. 45-6. Plaintiff apparently did not bring this discrete issue to an EEOC counselor until he sent an email to Bettie Bookhart on December 7, 2011, Dkt. 46-13 at 2-3, and he did not file the EEOC charge until January 6, 2012, Dkt. 46-12.

As for the viability of a reasonable accommodation, an email from Plaintiff to Clarke concerning their meeting in November 2011 is telling. Clarke questioned why Plaintiff claimed she had ignored a request for accommodation to which Plaintiff responded: "[W]e couldn't come up with a good idea [for memory problems], so we moved on to the back issue and about getting the chair. . . I'm not blaming you." Dkt. 45-12. Indeed, Clarke testified that at that meeting she asked

Plaintiff "what kind of accommodations he thought would help and he said, 'Well, I know we can't have tape recorders here so that's not going to work.' And I think we might have looked up online to see what kind of things [an online network for reasonable accommodations] might have suggested." Dkt. 106-2 at 12. This included a white noise machine, additional breaks, and possibly a snooze timer, but "what [Plaintiff and Clarke] saw on there weren't things that he was interested in so he wanted to just talk about the chair. So we left that alone and just went with the chair." *Id.*; *see also* Dkt. 106-1 at 30-31 (Plaintiff testified that "[w]e did look. . . . [W]e were looking specifically for ideas. . . . In the end, we couldn't come up with something.").

Clarke discussed the matter with Wright who said that he did not tell Plaintiff that Plaintiff could not take notes. Dkt. 106-2 at 12, 19. Clarke passed this information on to Plaintiff and noted "if [Plaintiff] still wanted to meet about it, that we could." *Id.* at 19. Plaintiff did not meet with Clarke to make a reasonable accommodation request for taking notes. *Id.* Based on Plaintiff's apparent failure to follow up on the note-taking request, Clarke concluded that Plaintiff did not want to make a reasonable accommodation request for note-taking. *Id.* at 19-20. This not only suggests that Defendant consulted in good faith with Plaintiff, but also that neither she nor Plaintiff could identify a reasonable accommodation.

One possible solution was additional time to take notes during meetings. In a letter attached to his EEOC charge, Plaintiff states that Wright frustrated this plan:

> Mr. Wright engaged in a practice of failing to notify me in a timely manner about at least two separate impromptu Team meetings around the last week of November and first week of December. My fellow digit-VSR had to come get me at my station on both occasions. I arrived late to both already-in-progress meetings, missing important work-related information. The act also negated my accommodation request to allow me time and opportunity to write down information to compensate for my disability. Since I told Mr. Wright about my request from our very first conversation, I can only conclude he was doing this intentionally so I would be at a disadvantage both as Team member and employee. I had to spend additional time trying to clarify and write down all missed info afterwards.

Dkt. 124 at 5. Although additional time for note-taking might be a reasonable accommodation for a one-on-one session between Plaintiff and another employee, it is the "impromptu" group meetings about which Plaintiff complains. Yet Plaintiff admits that even at those meetings other employees were "probably" taking notes:

> Q: Yes. And what did you expect everyone to do while you were [taking notes]?
> A. I don't have any thought or any care about what anyone else will do while I'm doing my notes. I'm the one that needs the accommodation. I will be concentrating during that period of time on taking down the information, the new information that I'm getting, putting it down in a note that makes sense to me. I'm not going to be concerned about what every other people is

doing while I'm taking a note. That's not for me to
concern or think about.
Q. Okay. Were other people taking notes at these
meetings?
A. Probably, one or other.

Dkt. 115-2 at 54. There is no indication that Plaintiff was not allowed to take notes

during the meetings. He testified that he did not carry around a pencil and paper

with him in the office. Dkt. 44-2 at 51. He further testified that Wright never

refused a direct request for Plaintiff to have time to get a pencil and paper for note-

taking. *Id.* at 51-52. Related, there is no indication Plaintiff was penalized for

taking time after the meetings to review and confirm his notes by himself or with

other employees. As in any workplace setting where deadlines are strict and

unexpected matters arise, it would surely be unreasonable to disallow "impromptu"

meetings altogether.

In fact, Defendant had already provided Plaintiff with arguably the most

logical accommodation to allow him to perform his job effectively: extensive

training and an offer for additional training as necessary. *See also Stewart v. Happy

Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1285 (11th Cir. 1997) ("The use

of the word 'reasonable' as an adjective for the word 'accommodate' connotes that

an employer is not required to accommodate an employee in any manner in which

that employee desires."). Defendant, for example, was not required to demote or

discharge other employees to make room for a transfer. *Boyle v. City of Pell City*,

866 F.3d 1280, 1289-90 (11th Cir. 2017). Nor was Defendant required to modify Plaintiff's job in such a way as to "transform the position into another one by eliminating functions that are essential to the nature of the job as it exists." *Lucas*, 257 F.3d at 1260.

Something else is conspicuously absent from the record: expert opinions concerning Plaintiff's short-term memory. Compare this to the reasonable accommodation request for a short-term memory disability in *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276 (7th Cir. 2015). There, the court had the benefit of an exhaustive medical report that followed two days of cognitive testing and interviews with a doctor and his wife. 788 F.3d at 282. The report also discussed a number of possible accommodations that included "making more written notes, completing documentation shortly after encounters, etc." *Id.* at 283. The doctor who prepared the report elaborated on his opinion in a deposition. *Id.* Even then, in finding for the employer, the Seventh Circuit found problematic the doctor's "lack of confidence in his proposed accommodations" and that he was "not sure whether note taking would help or not." *Id.* at 288.

The court analogized this to other cases that had "relied upon a conclusory and untested opinion/hope that the proposed treatment/accommodation would enable [the employees] to perform the essential functions of their jobs." *Id.* at 289; *see also Atwell v. Indianapolis-Marion Cty. Forensic Servs. Agency*, No. 1:14-cv-

01409-TWP-TAB, 168 F. Supp. 3d 1125, 1131, ECF: 66-24 (S.D. Ind. 2016) (allowing short-term memory case to proceed to trial where evidence included affidavit opinion of treating neurologist, apparently aware of the results of two prior rounds of neurological testing, that the plaintiff's "mental impairment substantially limited her major life activities of short-term memory, speaking, concentrating, and thinking").[10]

The only similarity between the facts presented here and *Stern* is the reliance on a conclusory and untested opinion. Plaintiff has never used the only memory testing performed on him to support his requests for reasonable accommodation. Indeed, because of the report's inconclusiveness and its failure to recommend any reasonable accommodation, any such reliance would be unavailing. *See* Dkt 45-4. Nor was the doctor who performed that testing deposed for this action. Thus, the only evidence of both a disability and the effectiveness of note-taking as a reasonable accommodation is Plaintiff's testimony and a very brief medical opinion.[11]

---

[10] Like Defendant, the employer in *Atwell* provided the plaintiff with additional time to complete training and with specialized sessions. 168 F. Supp. 3d at 1131. The employer in *Atwell*, however, eventually informed the employee "that she must resign or be terminated." *Id.* at 1134. One possible accommodation that was approved in *Atwell*, a "smart pen," might not be viable here for a group setting where, as Plaintiff himself suggested, sensitive information is discussed. *See* Dkt. 115-1 at 13. In any event, Plaintiff did not identify this or any other reasonable accommodation.

[11] This is also a point of distinction between the facts presented here and a case on which Plaintiff relied in his response to the original motion for summary judgment. Dkt. 72 at 15. Like in *Stern*, in *U.S. Equal Employment Opportunity Commission v. AIC Security Investigation, LTD,* 820 F. Supp. 1060, 1065 (N.D. Ill. 1993), the district court had at least a deposition from an expert witness.

Even if he has exhausted his administrative remedies, Plaintiff has not carried his burden to identify note-taking as a reasonable accommodation for his memory problems. Summary judgment in favor of Defendant on the note-taking claim is appropriate.

III.   The Ergonomic Chair and Mouse Pad

Plaintiff mentions a request for an ergonomic chair one time in his Third Amended Complaint: "On December 22, 2011, an ergonomic chair accommodation was granted after more than 60 days from the original request. Receipt of the chair still went delayed for several weeks afterwards." Dkt. 36 at 7. Plaintiff also sparsely alleges that "[h]is disabilities also made it hard for him to use some of the required office equipment assigned, for example, a computer mouse. In October 2011, Plaintiff requested a mouse pad from HR but his request was ignored." Dkt. 36 at 6. The shotgun-pleaded third complaint, moreover, does not specifically allege the chair and mouse pad as giving rise to his failure to reasonably accommodate disability count, merely incorporating by reference. Dkt. 36 at 20-21. Plaintiff mentioned neither in his initial complaint. Dkt. 1.

Defendant argues, and the Court agrees, that Plaintiff has failed to exhaust his administrative remedies with respect to these claims. Plaintiff did not include them on his EEOC charge. *See* Dkt. 122-4. Thus, in the absence of a reviewable final action, the Court lacks jurisdiction. *See, e.g.*, *Spinelli v. Goss*, 446 F.3d 159,

162 (D.C. Cir. 2006). Plaintiff counters that though he did not allege them at the administrative stage, "that claim will nevertheless be deemed to have been made if evidence of the claim was raised during the administrative process." Dkt. 122 at 4.

"An employee making a discrimination claim . . . must first exhaust [his] administrative remedies by filing a Charge of Discrimination with the EEOC." *Batson*, 897 F.3d at 1327-28 (citation omitted). "[J]udicial claims are allowed if they amplify, clarify, or more clearly focus the allegations in the EEOC complaint, but . . . allegations of new acts of discrimination are inappropriate." *Id.* (citation and internal quotation marks omitted). Yet "the scope of an EEOC complaint should not be strictly interpreted." *Id.* "[T]he proper inquiry is whether the [plaintiff's] complaint [is] like or related to, or grew out of, the allegations contained in [the] EEOC charge." *Id.* (citations and internal quotation marks omitted); *see also Gregory v. Georgia Dep't of Human Res.*, 355 F.3d 1277, 1279-80 (11th Cir. 2004).

Here, the claims for an ergonomic chair and mouse pad are not like or related to, nor grew out of, the claims on the EEOC charge, chiefly relating to Wright's conduct. This is not like *Gregory* where the plaintiff neglected to check the "retaliation box" on the document and the ensuing investigation "would have reasonably uncovered any evidence of retaliation." 355 F.3d at 1280. And in *Batson*, by comparison, the failure to accommodate claim was argued to be

"inextricably linked" to the retaliation claim "because her accommodation request was the basis for [the] retaliation against her, and her termination, mentioned in the Charge, was the specific form the retaliation took." 897 F.3d at 1328. Here, the claims are not even "reasonably related." *Danner v. Phillips Petroleum Co.,* 447 F.2d 159, 161-62 (5th Cir. 1971)[12]; *see also Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 898 (7th Cir. 1999) ("[A] failure to accommodate claim [for a chair] is separate and distinct from a claim of discriminatory treatment under the ADA. In fact, the two types of claims are analyzed differently under the law. Therefore, they are not like or reasonably related to one another, and one cannot expect a failure to accommodate claim to develop from an investigation into a claim that an employee was terminated because of a disability." (citations omitted)).

In support of his argument, Plaintiff points to the "brief description of claim" section in the January 20, 2012 counselor report submitted by Counselor Kimm Lenox where she noted the following statement from Plaintiff:

> I'm positive my documentation clearly indicates Mr. Wright's refusal to accommodate my request due to my memory issues—also his discrimination and retaliation against me. I made such requests both verbally and in writing, and he has never accommodated such simple requests.

---

[12] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent the decisions of the U.S. Court of Appeals for the Fifth Circuit rendered prior to the close of business on September 30, 1981.

Our HR Department attempted to come up with ideas other than me writing things down, but no alternatives were found. It was decided that telling supervisors I needed to write things down and communicating by email was the best we could do. They helped with my request of my back issue by providing an orthopedic chair.

1. First written accommodation request was on an email sent for VSCM Sandy Smith and dated around 10/04/11. Contact VARO management for copy of the email if needed.
2. Second request afterwards was during my first conversation with Mr. Timothy Wright around 10/11/11.
3. Third time was to HR Tamanique Clark when I requested accommodation for my memory disability, lower back, and wrist conditions around 10/13/11—she was unable to do anything about my memory condition. Contact her for specific dates and details.
5. Accommodation request was made to allow me an alternative to compensate for my memory issues— measures like sending all instructions in written format whenever possible, allowing me time to write things down, etc.—and for my back and wrist conditions.

Dkt. 71-11 at 4. But a more complete look at the record is revealing.

Before the above report, Lenox had prepared a January 9, 2012 letter for Plaintiff in which she outlined the "basis and claim" of Plaintiff's charge. Dkt. 46-12 at 2. Plaintiff responded in his own letter, noting that the sections "seem to be incomplete and it seems you missed some very important information." Dkt. 124 at 4. He then supplemented the information but made no mention of the chair or mouse pad. A December 31, 2012 report filed by the EEOC investigator, which reflected three amendments for "additional incidents of harassment" on April 13,

2012, July 19, 2012, and October 26, 2012, also outlined the claims and basis of the charge. Dkt. 124-1 at 4-6. Among 17 claims, there is no mention of a chair or mouse pad. *Id.* at 5-6.[13]

Months prior on October 13, 2011, Plaintiff had met with Clarke and requested an ergonomic chair as a reasonable accommodation for his back problems, and also mentioned wrist pads. Dkt. 45-12. Following his initial conversation with Clarke, Plaintiff obtained a note from Kim B. Powers, D.O., P.A. for an orthopedic chair and wrist support for a mouse. Dkt. 45-6 at 8. The note did not diagnose a medical condition, explain whether any condition substantially limits Plaintiff's ability to perform a major life activity, or outline how any accommodation will help Plaintiff in his job.[14] *Id.*

Plaintiff submitted the request for an ergonomic chair as a reasonable accommodation on November 16, 2011. Dkt. 45-6 at 3; Dkt. 71 at 10. On November 21, the VA requested medical documentation in support of the request and provided necessary paperwork. Dkt. 45-6 at 3. That documentation, which diagnosed Plaintiff with only "degenerative disk disease," was completed on

---

[13] Of course, EEOC regulations allow for adding only claims that are "like or related" to those in the original charge, which likely would have precluded unrelated claims concerning a chair or mouse pad. 29 C.F.R. § 1614.106(d).

[14] To be sure, it is not clear that it was Plaintiff's fault he did not initially obtain adequate medical documentation. In fact, Plaintiff takes issue with Clarke's handling of his requests as fleshed out in Clarke's deposition. *See, e.g.*, Dkt. 115 at 15-18; *see also* Dkt. 44-2 at 40. While potentially relevant to time limits, this fact does not relax the requirements for supporting a request for a reasonable accommodation.

December 15, 2011. *Id.* at 7. Plaintiff's request for the chair was approved on December 22, 2011. *Id.* at 2. He received a copy of the approval on January 3, 2012, weeks before he filed the EEOC charge. *Id.* Any delay is at least in part attributable to Plaintiff's failure to promptly provide medical documentation.

Neither Plaintiff's request for an ergonomic chair as a reasonable accommodation nor the supporting medical paperwork mentioned a mouse pad or wrist problems. Defendant, moreover, was presented with no evidence Plaintiff suffered serious carpal tunnel syndrome or any other wrist disability that might plausibly affect a major life activity. *See Terrell v. USAir, Inc.*, 955 F. Supp. 1448, 1453 (M.D. Fla. 1996*), aff'd*, 132 F.3d 621 (11th Cir. 1998) (finding that employee with carpal tunnel syndrome was not "substantially limited in the major life activity of caring for herself"); *see also Kempter v. Michigan Bell Tel. Co.*, 534 F. App'x 487, 492 (6th Cir. 2013) (declining to disturb district court's finding that employee's "carpal tunnel syndrome was a 'limited impairment [that] would not significantly restrict her ability to perform a broad range of jobs in various classes'"). Furthermore, Plaintiff's job assignment did not "so obviously require[]" an accommodation for a special mouse pad that there was no need for Plaintiff to make the request. *Musgrove v. Vilsack*, 173 F. Supp. 3d 1337, 1347 (M.D. Ga. 2016).

After the approval of the chair, Plaintiff did not file a request for a mouse pad as a reasonable accommodation or mention the issue on his EEOC charge. Defendant, in the absence of the required supporting medical documentation, did not provide a mouse pad.[15] *See* Dkt. 106-5 at 16; Dkt. 45-12; Dkt. 44-2 at 74.

It is clear that the processing of the above requests, which did not culminate in an EEOC charge, was distinct from the requests related to memory. The only connection between these claims and those included on the EEOC charge is that, to use Plaintiff's words, "they involved accommodation requests being made at the same time and handled by the same people." Dkt. 122 at 5. And though Plaintiff "claims the handling of [the chair and mouse pad] claims supports a conclusion the defendant improperly handled his memory claims," *id.*, Plaintiff provides no authority for the proposition that, even if relevant to separate conduct, this kind of bootstrapping can save an otherwise unexhausted claim.

Nor can he shoehorn unrelated claims into the EEOC investigation by broad-sweeping and nonresponsive answers during the investigation. For example, in response to a request for the details surrounding the charged incident, Plaintiff baldly replies, "Refer to all records provided for this investigation to all harassers

---

[15] Plaintiff eventually bought a mouse wrist pad at "Home Depot or Office Depot . . . or one of those" stores. Dkt. 106-1 at 37.

with requests made for ADA accommodation, as well as requests made to St. Petersburg's VARO Human Resources." Dkt. 122 at 7.

This is not enough for jurisdiction to lie and distinguishes this case from one like *Miller v. Fla., Dep't of Corr.*, No. 4:13-CV-288-MW/CAS, 2014 WL 12769510 (N.D. Fla. Mar. 27, 2014). Moreover, even if Plaintiff did exhaust his administrative remedies, Defendants did not fail to accommodate his request for the ergonomic chair. *Batson*, 897 F.3d at 1326-27 ("Absent [denial of a request for accommodation], there can be no failure to accommodate under the ADA."). Plaintiff argues the delay in processing his request was unreasonable because it was contrary to the VA's written policies,[16] yet cites no persuasive authority for the proposition. *See, e.g.*, *Terrell*, 132 F.3d at 628 (finding the district court did not err in concluding delay of three months reasonable). Clarke has testified that she and Defendant did "the best [they] could, anyway, when it came to ordering equipment." Dkt. 106-2 at 11. Lastly, as mentioned above, the Court is skeptical that Plaintiff's wrist problems substantially impairs major life activities. Summary judgment in favor of Defendant on the ergonomic chair and wrist pad claims is warranted.

---

[16] *See, e.g.*, Dkt. 106-3 at 12 ("All requests for accommodation should be processed as soon as possible so that the approval and the appropriate accommodation or the denial can be provided promptly. . . . Requests from employees should be processed within 30 calendar days, but preferably within less time. Failure to process some accommodation requests in less than 30 calendar days could constitute undue delay in violation of the Rehabilitation Act. . . . The time frame begins as soon as the applicant requests a change because of a disability. Do not wait for a written request.").

The above analysis obviates the need to resolve Defendant's good faith argument under 42 U.S.C. § 1981a. *See also EEOC v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1342 (11th Cir. 2016). As outlined above, however, the record evidence, particularly the unrefuted portions of Clarke's deposition, does show that Defendant acted in good faith in processing Plaintiff's requests. Summary judgment in Defendant's favor is warranted.

## CONCLUSION

The Court GRANTS Defendant's Motion for Summary Judgment. Dkt. 115. The Clerk is directed to enter judgment in favor of Defendant, terminate any pending motions, and close the case.

**DONE AND ORDERED** at Tampa, Florida, on April 4, 2019.


*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**


**COPIES FURNISHED TO:**
Counsel of Record